May it please the Court, William Glasser for the United States. The Army investigator did not turn Walker's voluntary interview into a custodial one by asking him about his extramarital relationships, even though they could possibly expose him to court-martial under the Uniform Code of Military Justice. And Mr. Walker's statements throughout the interview were given voluntarily. Turning first to the Miranda issue, the key error that the District Court made was in the fact that it could potentially elicit an admission that Mr. Walker was engaged in adulterous affairs was not charged very much in the military as it can be. Your Honor, that's correct. It is not charged frequently. It's the equivalent of a misdemeanor. And there's a series of factors that a commanding officer must consider in determining whether to bring such a charge. So simply asking that question or Mr. Walker answering that question, Mr. Walker would not likely be under the impression that he was admitting to a crime that would immediately subject him to an arrest. I point to the – for example, to the common law rule that an ordinary police officer may not arrest someone for a misdemeanor committed outside his presence. And there was no indication in this case even that CID investigators – there was testimony, in fact, that CID investigators will ordinarily not perform arrests unless there's a prior order in place. That's something that usually is done by the military police. So the context here does not indicate that simply admitting to these affairs, which could potentially subject him to court-martial, would not indicate that he was, therefore, in custody, as that term is used in the Miranda cases. Well, let's talk about whether he went voluntarily to the police department or to the CID office. Is it in a barracks? Where is that? Your Honor, it is – it's about 20 to 30 minutes away. That was the testimony. About 20 to 30 minutes away, and it is on another military installation. As you might know, Hawaii has a significant number of military installations. So the – he did go voluntarily, and the reason for that is that he – first of all, he initially requested to sit down on the sofa when the military police officer was just asking these very basic preliminary questions right after she came in and saw the body. But he reported – did he report it himself to the military police or – Yes, Your Honor, he did. He called 9-1-1, and 9-1-1 then transferred him to the military dispatch. He initiated that himself. That's correct. So at that point, he is a victim. He is not a suspect. He's the reporting party. No, but at some point, the agent Mitchell comes and says, you need to come with me. Correct. You need to come downtown. So I'm just curious. I wanted to explore that a little bit, because it looks like Mr. Walker is an E-5AD. I think his rank is a sergeant. That's correct, Your Honor. And he's in active duty, correct? Correct. And Agent Mitchell is employed by the United States Army CID, or Criminal Investigation Command. Is that right? Correct. And is a special agent. I'm not quite sure how the ranks work, but – So, Your Honor, a CID investigator is actually a civilian. It's always someone who's former military and then essentially leaves the military and comes back as a civilian investigator. But I think there's no question that someone who's in the military is going to sort of assume that he has to follow orders. I don't think there's any question there. So how does that factor into our voluntariness analysis here? Well, Your Honor, I think it's important to sort of step back and look at the broader context here. And it's comparable to a civilian situation where someone reports a crime, reports the death of his wife, the murder of his wife. And at that point, that triggers certain investigative responsibilities by the police force to determine – you know, to secure the crime scene, to determine a timeline, to determine who last saw the victim alive. So this is what any ordinary person would engage in in a similar situation. Well, but, I mean, Agent or Investigator Mitchell's language here was, in this military sort of context where Mr. Walker is, I think, probably going to feel like he has to maybe follow certain directives here, says that – I think the language Mitchell said he would go with Mitchell to the Army Station to get some details on the murder or Walker's finding of the murder scene. So I'm just trying to figure out – that seems more of a summons, you know, or a command and was a strong sort of language than I think you would normally find in that scenario might be not the same as we would normally find in a completely civilian setting. Well, Your Honor, this was a crime scene, so there was no question he couldn't stay in his house. And therefore, it was incumbent upon the investigators to take him to some other location to conduct the investigation. They needed to obtain clothing samples, for example, to determine whether or not some trace evidence would have been found on his clothing because he had been exposed to that crime scene. So, yes, there's certainly concern. I understand the Court's concern with the language used to summon him, but the district court itself concluded that he was not in custody at that point for Miranda purposes. The district court sort of arbitrarily drew that line at some later stage in the questioning. But I think looking at the broader context here, he is someone who's a victim. He voluntarily goes with police. He's not – he's not told that he's a suspect. In fact, the investigators testified they did not yet suspect him. And I would compare this to the – this Court's en banc decision in Crawford, where the defendant had actually been held at gunpoint during a parole search. And then it was subsequent to that parole search, he voluntarily went to the police station, and this Court concluded that he was not in Miranda custody. And this – nothing even – even at all akin to being held at gunpoint as part of a parole search occurred here. The part of the district court's ruling are you appealing? Your Honor, we're appealing the district court's ruling that he was in custody for Miranda purposes after those questions were asked about extramarital affairs. We're also – we're also appealing the district court's conclusion that both his pre-invocation and post-invocation statements are voluntary – were involuntary. Excuse me. Now, we concede that as to the post-invocation statements, there was a Miranda violation. We're only asking for those to be admissible for impeachment purposes. But the district court suppressed his pre-invocation statements from the time of the questions about the – about extramarital affairs until invocation suppressed them under both a voluntariness and a Miranda analysis. Right. The district court heard testimony. That's correct, Your Honor. And the testimony concerned how the questioning was conducted, I assume. Yes, Your Honor, it did. The district court was able to – also able to watch the video. And there's a transcript of the video that's included in the record. But to just briefly touch on the voluntariness, and then I'd like to reserve some time for rebuttal, the defendant has at no point pointed to any coercion by the police with respect to the pre-invocation statements. And the Supreme Court has made very clear in the Connolly case that some sort of police coercion is required. The district court pointed only to the fact that Mr. Walker was deprived of sleep, that he hadn't eaten much, and other factors to indicate he might have had a weakened mind. But police coercion is necessary. And with respect to the post-invocation statements, now, the district court did point to some indications of coercion, for example, in the manner of questioning. But we pointed out in our brief the – that there are cases indicating that that – those forms of questions are not improper. And those cases come from the Supreme Court and from this Court. Now, I want to just go back. I mean, but the summons is important in determining whether someone is in custody or voluntary. Is that correct? The summons language, it seems like that's what the law says. Your Honor, it is. It is. But I think it's to a fairly slight degree. And the reason for that is that you can give a voluntary statement even when you're in jail. There needs to be some sort of actual police coercion that's making you say something that you wouldn't ordinarily say. And on the coercion point, I think, and entirely – the entire voluntariness analysis, I think it's important to keep in mind that Mr. Walker, although we believe his statements are useful at trial, he never confessed to the murder of his wife. In fact, he made self-serving statements throughout, finally at the very end indicating that there had actually been threats by his co-defendant, Elsa Jackson. I'm talking about the custody analysis. Yes, Your Honor. I apologize. So – So certainly with respect to the custody analysis under Miranda, absolutely. This Court has indicated that the language used to summon is one important factor. However, it's a totality question, and the context here indicates that he was not in Miranda custody. And if I may, I'd like to reserve the remainder of my time. Yes. May it please the Court. Judge Murguia, Judge Schroeder, Judge Seiler, my name is Bernie Bervar. I represent the appellee, Defendant Michael Walker, in this case. The district court, Judge Moway, is correct that it's not even a close call that Walker's Most Miranda statements were involuntary, that they were a coerced product of abusive police interrogation. Now, the facts for this issue with respect to this interrogation are undisputed. They're all on the video. The video speaks powerfully. As I told the Court, it's in the record. I told the Court at the hearing on this, and I even referenced it in my brief, that this is the worst police interrogation misconduct I've seen in 34 years of criminal practice. At what time did your client say he wanted a lawyer? He said he wanted a lawyer right when he was read Miranda rights. It was about, I believe, two minutes after 2 o'clock. It was in the afternoon. He'd been there for how long before? He'd been there. He got there about 9 o'clock in the morning. He came home from work. He worked a 12-hour shift at Tripler Hospital. He was a medic nurse at Tripler Hospital. Worked a 12-hour shift, came home, left work at 6, got home at 6.30, found his wife's body, called 911. He notified the authorities himself. He did, absolutely. He called 911, opened the door for interrogation. Let me ask you some questions. Where was Mr. Walker released to after the interview with Agent Mitchell and being in the Army CID question or station for questioning? He didn't leave the station or the CID station until about 10 o'clock that night.       He was in the Army CID station for questioning. He was in the Army CID station for questioning. He had a friend or a sergeant or another sergeant or a friend from his company picked him up and they found him a place to stay at the, I believe it was the bachelor's office, bachelor's enlistment quarters. It was a place on post, on base. So was he, he was free to go afterwards? Yes, that night, that night. He was at the station for over 12 hours, I think, from 9 o'clock in the morning where Agent Mitchell said, you need to come with us. And I think the Judge Mulway said he tends to speak in imperatives. You need to come with us. And he's in the military. He doesn't, he can't say no. He wasn't interviewed during all that time, was he? No, no. Before he asked for a lawyer, he had been interviewed, what, about an hour? I believe it was about, he'd been interviewed for about an hour. Then they took a lunch break and the lunch break was about an hour and 20-minute lunch break. They brought him some food. If you watch the video, he sits there and he takes a moment in prayer. He takes one bite of a hamburger and then he doesn't eat anything. But he's in the room for a long time by himself. Before he was interviewed, they took his cell phone. They took his clothes. They scraped his fingernails for DNA. They took DNA swabs. So he was given the full treatment. Mr. Walker consented, it seems clear, to have his phone vehicle in person searched when he served, when he arrived at the Army CID. So I'm just trying to figure out, shouldn't this cut against a finding of custody where it shows that he consented to officers taking some of his property and hauling it to search? Doesn't that seem to indicate a voluntariness? Well, he did consent to that and he did consent to the search early on. He was in the police station. So when we're looking at the totality of the factors, does that not factor in and cut against? Well, that all factors in the totality of circumstances. I would submit that the pre-Miranda statements here, although the judge found that the pre-Miranda statements that he was in custody when he was asked about the extramarital questions and that those were not voluntary, the judge did say that that was a close call. Those are not critical to the trial of this case. This is an interlocutory appeal. So when this comes down, we're going back to trial. There's a lot of other evidence about the extramarital affairs he had from both Craigslist and Facebook, and they've got probably four or five witnesses that are going to testify. We're really not disputing the extramarital statements. So your main thrust is the voluntariness after Miranda. Absolutely. Absolutely. The repeated police abuses. He asked him, do you want a lawyer? Walker says yes. Agent Mitchell says, oh, you want a lawyer? Well, here's the deal, you know. I've got to ask the questions. But the only thing that happens there is that the prosecution is not going to introduce it in the case in chief, but using it only for impeachment purposes, right? Right. That's the significance of that. That is a huge significance that they can use it for impeachment purposes. I believe my client will testify. I think the government expects him to testify. And they can commit these abuses thinking we'll just get it in when the defendant testifies. That's no prevention there. What the agent did in this case, and again, Judge Mulway was correct in finding it wasn't even a close call. There was repeated Miranda violations. He asked for a lawyer twice. He says, you want a lawyer? And he says, I don't want to talk right now. The agent just kept bulldozing through. Then he said, I don't want to talk about this anymore. The agent kept bulldozing through. Finally, he says, can I have my lawyer now? He's crying through this whole process. And I would urge you to watch the video. Everything's on there. You can make a statement in violation of Miranda that can be voluntary anyway, can you not? Those are two different things. They are two different things. There's Miranda and compliance, and then there's the voluntariness. Involuntary or coerced statements cannot be used in any way because they're inherently unreliable. And that's what Judge Mulway found, and that's my position on this. My position has always been that those post-Miranda statements were a product of coercion by the abusive police conduct of Agent Mitchell. He deceived him, said we've got your ‑‑ there's a number of factors Judge Mulway found. Deception, we've got your fingerprints on the knife. We're going to find your DNA. Forensics are going to come back that you did it, accused him of murdering his wife. He appealed to the religion. He said you should confess and save your soul. Your wife, Kathy, would want you to be saved. You should confess. And then he played the military card with his commander. He says, you know, I have to talk to your commander about this. He's going to want to know what you did. Your commander would appreciate a confession. Then he finally, he says, look, a confession will be good for you. He said a confession will set you free, implying that everything will be fine if he just confesses. What's your argument regarding being confronted with the extramarital affair? How does that, in your view? Well, I agree with the judge that confronting him with those questions, I mean, he should have been read Miranda before those questions. Well, but he wasn't being asked or being confronted with evidence of the underlying crime, which was the murder of his wife. I'm just trying to figure out if the court has applied the custodial factor of confrontation in similar to this situation where it's a different offense. Well, I think that's what she did is she said when he was confronted with. I know. And what's the authority? Do you have any authority for that? Well, again, as the judge said, I agree with the court that that's a close call, and I don't believe that that is critical or even really a real issue when we get to trial in this case because there's going to be lots of evidence with respect to that. So my concern in this case is the post-Miranda statements being involuntary. Let me understand. There was video of the interrogation. Yes. And there was a transcript of that, which we have. And there was also testimony from the officers and from Walker. Yes. Not from Walker, but from Agent Mitchell. There is a transcript of the testimony. If the court has time, I would urge you to look at the video. That is extremely telling. I mean, just the power of the agent's tone of voice doesn't come through in the transcript. And the government tries to isolate these factors and say, you know, deception, religion, telling your commander that any one of these factors themselves don't create an involuntary statement, but it's the cumulative effect of all of those factors combined with the repeated Miranda violations. In all the cases that they've cited, Miranda was read and waived. And in a lot of the cases they've cited, this is the Organ v. Haas, the Miller case, the Ledbetter case, the Tompkins case, the Leon Guerrero, Miranda was read and waived a number of times by the defendants in those cases. But what we've got here is he invokes Miranda, and the agent just keeps going forward. The government says, well, his will wasn't overborne because he didn't confess. Didn't confess to the murder. Well, what they haven't really maybe considered is maybe he's innocent. He didn't do it. But every time he would give the agent something about his affair with Lisa to just make up something, just get the agent to stop. That's the hallmark of a coerced involuntary statement. And in closing, I would just urge the Court to find that the ---- Can I just ask you before you conclude? So you ---- it sounds like you agree or concede that he wasn't in custody pre-Miranda. He was or was not? He was not in custody. I'm trying to figure out your position on pre-Miranda. The Court found that he was in custody at the point that he was read the extramarital. And so I agree with the Court. However, I've said that's not critical to this case. What's critical to this case from the defendant's, the appellee's standpoint is that the post-Miranda statements are involuntary. Okay. Thank you very much. Mr. Glaser? Is it Glaser? Thank you. Just a few brief points on rebuttal. First, with respect to the ---- whether the evidence is critical with respect to the pre-invocation statements, that's a call for the government to make. The U.S. attorney certified under 3731 that this was important. And I can explain the reasons to the Court. He said many things after the district court determined that he was in custody, such as that he and his wife had the only keys to the house, that the key ---- she was good at checking doors, that the keys had not actually been stolen at the car break in the previous week. There's a lot of information there that the government believes is very important to its case in chief. That's our call, not the defendant's. But with respect to the issue that he seems to really care about, which is the impeachment evidence of the post-invocation statements, we're not afraid of having the Court look at the video. We think that actually the video supports our view that his statements were voluntary throughout this interview, and therefore, we think that the Court should reverse the district court's decision. Unless the Court has further questions, thank you. Thank you both for your presentations here today. The case of United States of America v. Michael Walker is now submitted.
judges: Siler, Schroeder, Murguia